737 S.E.2d 601

**DUNES WEST GOLF CLUB, LLC, Appellant,**

v.

**TOWN OF MOUNT PLEASANT, Respondent.**

**Appellate Case No. 2011–194211.**

**No. 27208.**

Supreme Court of South Carolina.

Heard April 3, 2012.

Decided Jan. 9, 2013.

G. Trenholm Walker and Katie Fowler Monoc, both of Pratt–Thomas Walker, PA, of Charleston, for Appellant.

Frances I. Cantwell, of Regan and Cantwell, LLC, of Charleston, and David G. Pagliarini, of Hinchey Murray & Pagliarini, LLC, of Daniel Island, for Respondent.

Justice KITTREDGE.

In this direct appeal, Appellant Dunes West Golf Club, LLC, challenges the trial court's grant of summary judgment in favor of Respondent Town of Mount Pleasant. We affirm.

Dunes West is a 4,518–acre development in Mount Pleasant, South Carolina. This case concerns only the Dunes West golf course property, which consists of 256 acres. As more fully described below, in 2006, the Town of Mount Pleasant amended its zoning ordinance to create the Conservation Recreation Open Space zoning district, which imposed land-use restrictions on all golf course properties in Mount Pleasant, permitting only recreation and conservation uses. Appellant desired to carve out residential lots on the golf course property by designating several noncontiguous parcels as potential home sites. Although Appellant has presented varying acreage amounts and has failed to identify specifically what portion of the golf course property it seeks to develop,[1] it is clear residential development would require significant alterations to the golf course area of play. Because the new zoning designation did not permit construction of new homes, Appellant sought to have the golf course property rezoned to allow residential development. The Town denied the rezoning request, and Appellant filed suit, claiming the Town's actions violated its equal protection and due process rights, and amounted to an unconstitutional taking of its property. Following discovery, the Town of Mount Pleasant successfully moved for summary judgment. We have carefully reviewed each assignment of error and find summary judgment was properly granted. With this synopsis in mind, we now discuss the relevant facts and applicable law in detail.

## I.

The Dunes West Development ("Development") is located on 4,518 acres of land within Respondent Town of Mount Pleasant ("Town"). The principal of Appellant Dunes West Golf Club, LLC ("Appellant"), John Weiland, through other corporate entities, purchased the undeveloped residential lots and the master developer rights to the Development in 2002, and thereafter invested considerable sums repairing the Development's infrastructure and updating its amenities. This appeal concerns only a small portion of the Development—

---

1. Appellant's various proposals are best described as a moving-target approach, which we discuss fully in the body of this opinion. In essence, Appellant has failed to identify precisely what property is the subject of this lawsuit, as it has given widely varying representations, ranging from 16.48 acres to 17.86 acres to 25.16 acres to 60.4 acres.

namely, the 256 acres laid out over six contiguous tax map parcels that comprise the Dunes West Golf Course, related facilities and the immediately surrounding property, which we will refer to as the "Golf Course Property." Appellant acquired the Golf Course Property in 2005,[2] and at that time, the Development and the Golf Course Property were subject to the zoning requirements of the Dunes West Planned Development ("DWPD"), which permits flexible land use at the developer's discretion.[3]

According to Weiland, at the time Appellant acquired the Golf Course Property, he believed the golf course was an important amenity for the Development[4] and that there was unused land located on and around the golf course that had potential for residential development. It is this potentially developable land on the Golf Course Property that is at the center of this case.

Weiland initially identified these developable portions of the Golf Course Property by instructing an employee to walk the property and make note of any undeveloped areas outside the out-of-bounds markers on the golf course.[5] This informal

2. The Golf Course Property was previously severed from the Development and sold to a separate owner. Since initial construction in the early 1990s, the Golf Course Property has been used continuously for golf purposes with few, if any, changes.

3. The DWPD is a site-specific development plan allowing considerable flexibility regarding land use. Essentially, the DWPD master land-use plan provides for mixed uses throughout the Development and sets forth amounts of land assigned for particular uses but in no particular locations. Accordingly, the location of a particular use is determined at the developer's discretion and may be changed or shifted, essentially without Town oversight so long as minor development standards, such as setback requirements, are met and the overall density of the 4,518–acre development does not increase. For a detailed discussion regarding the characteristics of planned development districts in general, *see Sinkler v. County of Charleston*, 387 S.C. 67, 690 S.E.2d 777 (2010).

4. Weiland also believed the golf course was an important recreational feature to attract future residents of the Development and that continuity of ownership between the Development and the golf course was desirable to protect his substantial investments in the 4,518 acre Development.

5. According to Weiland's deposition testimony, he has owned and developed several golf courses over his thirty-five year career and is

approach first resulted in the identification of a series of noncontiguous lots, which together comprised approximately 57 acres. Neither Weiland nor anyone on his behalf examined existing plats to ascertain the location of easements and other restrictions or conducted any engineering analysis of soils, utilities, or potential impact to the golf course itself in identifying the developable areas.

As will be discussed below, as the matter proceeded to and through litigation, Appellant has presented widely varying projections as to precisely what part of the Golf Course Property was to be carved out for residential development. Nevertheless, all of the approaches had one thing in common—the alteration of the golf course, the filling of wetlands and the relocation of several easements which Appellant did not own.

In 2005, before Appellant took any formal steps in furtherance of residentially developing a portion of the Golf Course Property, a number of golf courses throughout the coastal area of South Carolina were converted for use as residential home sites. Local city and county councils became concerned about this increasing golf-course conversion trend, particularly where developers exploited flexible, planned development zoning provisions to level existing golf courses without any oversight from local government. Among those concerned municipalities was the Town. Believing a prompt, proactive approach was in the best interests of the Town and its residents, the Town examined the existing zoning designations and permitted uses for all golf course properties within its borders to determine whether and to what extent future development could be evaluated and controlled.

As a result, to "more effectively control the process of converting golf course property to other uses" and to "balance the interests of golf course property owners and golf course community residents with respect to such conversion of use," the Town's planning commission proposed implementing a new

familiar with the out-of-bounds markers around the edges of golf courses. Weiland stated that, when considering whether to purchase the Golf Course Property, he viewed everything beyond the out-of-bounds markers as "good dirt" or developable land. Weiland stated that he "made the assumption that everything that was beyond those boundaries w[as] right for development."

zoning district—namely, the Conservation Recreation Open Space ("CRO") district. *See* Town of Mt. Pleasant, S.C., Code § 156.333 (2006). The CRO zoning designation permits only recreation and conservation uses and prohibits residential development.[6] According to a Town planning commission staff report:

> Rezoning all [golf] courses to CR-O or amending the PDs would not necessarily prevent future development of the golf course properties. It would provide that the owner of the course would be subject to the rezoning process including a public hearing should the owner desire to redevelop part or all of the golf course for some other type of development. Town Council approval would be required.

*See Town of Mt. Pleasant Planning Comm'n Public Hearing* (April 19, 2006) (statement of Christiane Farrell, Div. Chief, Mt. Pleasant Planning Dep't).

During the public hearing process on the proposed CRO Ordinance, Appellant voiced its opposition to including the entirety of the Golf Course Property in the CRO designation, claiming a total of 60.4 acres was not "part of the golf course" and was suitable for residential development. Appellant contended this 60.4 acres should remain subject to the DWPD's flexible floating zoning. However, no plat or survey of the proposed developable land existed at that time, and no graphic or other pictorial depiction of those areas was ever presented to the Town. The Town's zoning administrator testified at deposition that:

> [I]t would have been very difficult, if not impossible, for [the Town] to decide or to determine what was indeed—what the developer considered developable land, not a part of the golf course, unless they showed it to us. And to my knowledge, that didn't occur until later on in the process [after the enactment of the CRO ordinance].

Following the public hearing process, the Mount Pleasant Town Council ("Council") voted to amend the Town's zoning

---

6. The various recreational uses permitted in a CRO district include: golf courses, driving ranges, tennis courts, play fields, swimming pools and park land. Accessory uses, such as club houses, restroom and locker room facilities, snack bars, and parking areas, are also permitted. *See* Town of Mt. Pleasant, S.C., Code § 156.333(B).

ordinance to create the new CRO zoning district. *See* Town of Mt. Pleasant, S.C., Ordinance No. 06031 (June 14, 2006). Using tax-map-parcel boundaries, the Town identified the land parcels comprising part of any one of the Town's five golf courses, and either by way of direct rezoning or an amendment to the relevant planned development, each of those parcels was designated as a CRO district. *See* Town of Mt. Pleasant, S.C., Ordinance Nos. 06032 (Patriot's Point Golf Course); 06033 (Snee Farm Country Club); 06034 (Charleston National Country Club); 06035 (Dunes West Golf Club); 06036 (Rivertowne Country Club) (June 14, 2006).

At Dunes West, the new CRO district was comprised solely of the 256–acre Golf Course Property. Following this amendment, the Golf Course Property was no longer subject to the flexible floating zoning of the DWPD. Instead, that land was subject to the use limitations of the CRO Ordinance, which did not permit residential development.

In 2008, Appellant submitted a rezoning petition seeking residential development of a portion of the Golf Course Property. This time, Appellant claimed that 17.93 noncontiguous acres located within the Golf Course Property were developable for residential lots. The location of the acreage sought to be rezoned fell within areas of play of the golf course and would have required extensive alterations to the course.[7] The rezoning petition also contemplated filling wetlands and the abandonment of an easement not owned by Appellant. In addition, at the time of Appellant's rezoning request, there were approximately 1,200 available lots outside the Golf Course Property in the Development designated for residential use.

---

7. The 2008 proposal included relocation of the teeing areas of four different holes, which would result in the reduction of the ninth hole from a par-four to a par-three hole and the eleventh hole from a par-five to a par-four hole. Additionally, that proposal would have required the reconfiguration of the putting greens for two holes, clearing various wooded areas, and relocation of approximately 1,700 linear feet of cart path, partly to areas without existing cart-path easements. Appellant's desire to maximize development prompted it to propose adding various lots in such close proximity to the course that installation of almost 1,000 linear feet of safety netting would be required along the tenth hole and the practice range to protect nearby homes from errant golf shots.

Appellant's petition prompted spirited public debate. The planning commission recommended that Appellant's proposal be denied by Council on the basis that it did not comport with the rezoning criteria set forth in the Town's Code of Ordinances. *See* Town of Mt. Pleasant, S.C., Code § 156.031(C) (providing the factors for consideration by the planning commission for rezoning requests, including: the relationship of the request to the Town's comprehensive plan; whether the request violates or supports the comprehensive plan; whether the uses permitted by the proposed change would be appropriate in the area concerned; whether adequate public facilities and infrastructure exist or could be provided in the area of the proposed development; the amount of vacant land in the vicinity currently classified for similar development; and whether the proposed change is consistent with the land development regulations of the Town). However, Appellant withdrew its rezoning petition prior to its submission for Council's consideration.

In April 2009, Appellant submitted another petition, this time seeking rezoning of 16.48 acres of noncontiguous land to permit residential development. Like the 2008 petition, the 2009 proposal included acreage within areas of play that would have required the filling of wetlands, the abandonment of easements it did not own, and many of the same extensive alterations to the golf course involved in the previous rezoning petition.[8] Spirited public debate again ensued, with Town residents strongly opposing the request. Ultimately, Council denied Appellant's rezoning petition.

Appellant filed the underlying suit, claiming the Town's actions in designating the entirety of the Golf Course Property as a CRO district and refusing its rezoning petition amounted to a taking of 60.4 acres of the Golf Course Property and violated Appellant's substantive due process and equal protection rights. The circuit court granted summary judgment in favor of the Town on each of Appellant's claims, which Appellant now appeals.

---

8. These necessary alterations include reconfiguration of the fairway of the tenth hole, shortening the ninth and eleventh holes, including reducing the eleventh hole from a par-five to a par-four hole, moving several tee boxes, and relocating the maintenance shed and numerous cart paths throughout the Golf Course Property.

## II.

A trial court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. "When opposing a summary judgment motion, the nonmoving party must do more than 'simply show that there is a metaphysical doubt as to the material facts but must come forward with specific facts showing that there is a genuine issue for trial.'" *Russell v. Wachovia Bank, N.A.*, 353 S.C. 208, 220, 578 S.E.2d 329, 335 (2003) (quoting *Baughman v. Am. Tel. & Tel. Co.*, 306 S.C. 101, 107, 410 S.E.2d 537, 545 (1991)). "[T]he opposing party may not rest upon mere allegations or denials, but must respond with specific facts showing a genuine issue." *City of Columbia v. Town of Irmo*, 316 S.C. 193, 195, 447 S.E.2d 855, 857 (1994).

## III.

### A. Equal Protection

Appellant claims summary judgment on its equal protection claim was improperly granted because it presented evidence that the Town granted another substantially similar rezoning petition, and there was no rational basis for the Town's disparate treatment of the two requests. We disagree.

The Equal Protection Clause provides "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Where an alleged equal protection violation does not implicate a suspect class or abridge a fundamental right, the rational basis test is used. *Denene, Inc. v. City of Charleston*, 359 S.C. 85, 91, 596 S.E.2d 917, 920 (2004) ("'When social or economic legislation is at issue, the Equal Protection Clause allows the states wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.'" (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985))). Under the rational basis test, the Court must determine: 1) whether the law treats similarly situated enti-

ties differently; 2) if so, whether the legislative body has a rational basis for the disparate treatment; and 3) whether the disparate treatment bears a rational relationship to a legitimate government purpose. *Ed Robinson Laundry & Dry Cleaning, Inc. v. S.C. Dep't of Rev.*, 356 S.C. 120, 124, 588 S.E.2d 97, 99 (2003).

Following the downzoning of all the golf courses within the Town, developers from another golf course, Snee Farm Country Club ("Snee Farm"), sought rezoning of a contiguous, twenty-acre portion of their property from CRO to a designation that would permit development of 58 single family homes. Snee Farm presented a comprehensive development proposal and a detailed impact assessment to Council in support of its request. Monies generated from sales were to be placed in a trust account and applied to specific recreational improvements, including reconstructing the clubhouse, improving existing tennis courts, and constructing a new events pavilion, pool, and practice green with an expanded driving range. Snee Farm's rezoning petition involved virtually no alteration to golf course areas of play. Although community support for the Snee Farm rezoning proposal was divided, there was general support in favor of the proposal. Council granted Snee Farm's request and rezoned approximately 20 acres of land to permit the proposed residential development.

Like the Snee Farm rezoning petition, Appellant's petition requested rezoning of approximately 17 noncontiguous acres to develop 32 residential lots. However, unlike Snee Farm's request, Appellant's rezoning petition did not include an assessment of the potential effects on traffic, drainage, and other conditions in the surrounding area. Next, effectuating Appellant's plan required filling some areas of wetlands, relocating existing easements, and extensive alterations to the golf course, as detailed above. *See Whaley v. Dorchester Cnty. Zoning Bd. of Appeals*, 337 S.C. 568, 578, 524 S.E.2d 404, 409 (1999) (noting a legitimate government interest exists in limiting traffic and protecting aesthetic qualities in residential zones). Further, the Dunes West community was in overwhelming opposition to the rezoning petition. *See, e.g., Sowers v. Powhatan County*, 347 Fed.Appx. 898, 903–04 (4th Cir.2009) (holding public opposition furnishes a rational basis for differential treatment in zoning decisions); *Harbit v. City*

*of Charleston,* 382 S.C. 383, 396, 675 S.E.2d 776, 783 (Ct.App. 2009) ("[The Equal Protection Clause] does not prohibit different treatment of people in different circumstances under the law.").

The trial court correctly found there were significant differences between the two rezoning petitions, which demonstrated a rational basis for granting Snee Farm's proposal and denying Appellant's proposal. Specifically, the trial court found that, from a land-use perspective, "the Snee Farm proposal presented a compact, contiguous, unified site design that caused little alteration to the areas of play of the golf course. The Dunes West proposal contemplated spattering new lots throughout the Golf Course Property that caused multiple alterations to the areas of play." We find the two rezoning petitions were not similarly situated as a matter of law because there were material differences between them, and those differences are rationally related to the purposes of the CRO Ordinance. Moreover, Appellant has failed to produce any evidence that the denial of its rezoning petition was motivated by discriminatory goals. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 566, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (Breyer, J., concurring) (noting that the distinguishing factor between "run-of-the-mill zoning cases [and] cases of constitutional right" is the presence of a factor demonstrating " 'vindictive action,' 'illegitimate animus' or 'ill will.' "); *Whaley,* 337 S.C. at 576, 524 S.E.2d at 408 ("To prove that a statute has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another. A violation is established only if the plaintiff can prove that the state *intended* to discriminate." (emphasis in original)); *Butler v. Town of Edgefield,* 328 S.C. 238, 250–51, 493 S.E.2d 838, 845 (1997) (plaintiff did not establish Equal Protection claim where he failed to allege or set forth any facts which could establish purposeful or intentional discrimination). Accordingly, we affirm the grant of summary judgment with respect to the equal protection claim.

## B. Substantive Due Process

Appellant claims the trial court applied incorrect legal standards in considering its substantive due process challenges

and that the existence of genuine issues of material fact preclude summary judgment on those claims. We find the trial court properly granted summary judgment in favor of the Town as to Appellant's facial challenge to the CRO Ordinance because Appellant has failed to point to any specific fact which creates a genuine issue for trial. In addition, because the zoning classification of one's land is not a cognizable property right, summary judgment was properly granted as a matter of law regarding Appellant's as-applied challenge.

■■ "The authority of a municipality to enact zoning ordinances, restricting the use of privately owned property is found in the police power." *McMaster v. Columbia Bd. of Zoning Appeals,* 395 S.C. 499, 505, 719 S.E.2d 660, 663 (2011). "In reviewing substantive due process challenges to municipal ordinances, a court must consider whether the ordinance bears a reasonable relationship to any legitimate interest of government." *Id.*

■■ "In order to prove a denial of substantive due process, a party must show that he was arbitrarily and capriciously deprived of a cognizable property interest rooted in state law." *Harbit,* 382 S.C. at 394, 675 S.E.2d at 782 (citing *Sunset Cay, LLC v. City of Folly Beach,* 357 S.C. 414, 430, 593 S.E.2d 462, 470 (2004)). "The State's deprivation of the property interest must fall so far beyond the outer boundaries of legitimate governmental authority that no process could remedy the deficiency." *Id.* "Every presumption will be made in favor of the constitutionality of a legislative enactment; and a statute will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution." *McMaster,* 395 S.C. at 504, 719 S.E.2d at 663.

■■ "A legislative body does not deny due process simply because it does not permit a landowner to make the most beneficial use of its property." *Harbit,* 382 S.C. at 394, 675 S.E.2d at 782. "Courts cannot become city planners but can only correct injustices when they are clearly shown to result from municipal action." *Knowles v. City of Aiken,* 305 S.C. 219, 222, 407 S.E.2d 639, 642 (1991). "In order to successfully assault a city's zoning decision, a citizen must establish that the decision was arbitrary and unreasonable." *Id.* at 224, 407

S.E.2d at 642. "And in the context of a zoning action involving property, it must be clear that the state's action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.'" *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir.1995) (quoting *Nectow v. Cambridge*, 277 U.S. 183, 187–88, 48 S.Ct. 447, 72 L.Ed. 842 (1928)).

## 1. Facial Substantive Due Process

In its facial substantive due process challenge, Appellant argues the trial court erred by applying an "arbitrary and capricious" standard rather than the freestanding "substantially advances" standard test it claims was set forth in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). Further, Appellant contends summary judgment was improperly granted because there is a genuine issue of material fact whether the CRO ordinance "substantially advances" a legitimate Town interest. We find the trial court did not err by applying the "arbitrary and capricious" standard. Further, we find the CRO Ordinance is not arbitrary or capricious and, in any event, the ordinance substantially advances numerous legitimate Town purposes. We therefore hold the Town is entitled to judgment as a matter of law.

The purposes of the CRO ordinance as set forth therein are:

(A) *Purpose of district.* The purpose of this section is listed as follows:

(1) To provide for, and permit, an appropriate valuation by the tax assessor and/or land appraiser that reflects the conservation, recreation, and/or open space use of land.

(2) To ensure the preservation of conservation, recreation, and/or open space use of land against undesirable development.

(3) To lessen the hazards and loss of property, life, and the reduction of health and safety due to periodic inundation of flood waters, by restricting or prohibiting uses in those areas.

(4) To provide opportunities for improved public and/or private recreation activities.

(5) To provide for a community-wide network of open space, buffer zones, and recreation spaces.

Town of Mt. Pleasant, S.C., Code § 156.333(A).

Joel Foard, the director of the Town's planning and development department, testified at deposition that, although he did not know of any studies conducted specifically with regard to drafting the CRO Ordinance, the Town "had a long history of trying to preserve open space." Foard further testified that, since the mid–1980s, the Town extensively studied open space preservation through various master planning and comprehensive planning processes, including the creation of the Mount Pleasant Open Space Foundation to assess the need for and existence of open space areas within the Town on an ongoing basis.

"The burden of proving the invalidity of a zoning ordinance is on the party attacking it, and it is incumbent on respondent to show the arbitrary and capricious character of the ordinance through clear and convincing evidence." *Town of Scranton v. Willoughby*, 306 S.C. 421, 422, 412 S.E.2d 424, 425 (1991). "[I]n cases requiring a heightened burden of proof ... the non-moving party must submit more than a mere scintilla of evidence to withstand a motion for summary judgment." *Hancock v. Mid–S. Mgmt. Co., Inc.*, 381 S.C. 326, 330–31, 673 S.E.2d 801, 803 (2009).

Appellant claims the trial court erred in analyzing its substantive due process claim under the "arbitrary and capricious" framework instead of pursuant to a "substantially advances" theory. We disagree.

In *Agins v. City of Tiburon*, the United States Supreme Court stated that regulation of private property "effects a taking if [it] does not substantially advance [a] legitimate state interes[t]," and concluded that, under the facts of that case, no taking occurred because the challenged zoning ordinances "substantially advance legitimate governmental goals." 447 U.S. 255, 260–61, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

Twenty-five years later, in *Lingle*, the Supreme Court "correct[ed] course" and clarified that "the 'substantially advances'

formula was derived from due process, not takings precedents." 544 U.S. at 540, 125 S.Ct. 2074 (noting that "a municipal zoning ordinance would survive a substantive due process challenge so long as it was not 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare' ") (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 394–95, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). Justice Kennedy concurred separately in *Lingle*, specifically noting that although the Supreme Court had "no occasion to consider" whether the challenged regulation violated due process,[9] the majority opinion was not meant to "foreclose the possibility that a regulation might be so arbitrary or irrational as to violate due process," and noted "[t]he failure of a regulation to accomplish a stated or obvious objective would be relevant to that inquiry." *Id.* at 548–49, 125 S.Ct. 2074 (Kennedy, J., concurring).

Appellant argues the United States Supreme Court's *Lingle* decision establishes that the "substantially advances" theory is a new, freestanding due process test and that the trial court erred by applying the "arbitrary and capricious" due process framework in granting summary judgment. Although we acknowledge the potential relevance of a "substantially advances" inquiry within the due process analysis, we do not read the *Lingle* decision as abandoning the established "arbitrary and capricious" framework; rather, we view the "substantially advances" theory as embraced within the "arbitrary and capricious" analysis. *See id.* at 542, 125 S.Ct. 2074 ("[A] regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause.") (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (stating that the Due Process Clause is intended in part to protect the individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective")); *see also City of Orangeburg v. Farmer*, 181 S.C. 143, 186 S.E. 783, 785 (1936) (striking down an ordinance prohibiting door-to-door sales calls as unconstitu-

---

9. There was "no occasion to consider" that issue because the landowner had voluntarily dismissed its due process claim below and argued only a "substantially advances" theory in support of its takings claim on appeal.

tional based on a finding that the ordinance failed to further the public health, safety, or welfare and was therefore unreasonable).

We find the trial court did not err by considering Appellant's substantive due process challenge under the "arbitrary and capricious" framework. *See, e.g., Worsley Cos. v. Town of Mt. Pleasant,* 339 S.C. 51, 56, 528 S.E.2d 657, 660 (2000) (noting "[s]ubstantive due process prohibits a person from being denied life, liberty or property for *arbitrary* reasons" and that "[a] plaintiff must show that he was *arbitrarily and capriciously* deprived of a cognizable property interest rooted in state law" (emphasis added)).

Additionally, Appellant claims summary judgment was improper because it created a genuine issue of fact as to whether the CRO Ordinance is arbitrary and capricious because the Town lacked an adequate factual basis to support each of the purposes stated therein. We reject Appellant's argument because Appellant fails to identify any specific facts showing a genuine issue for trial; rather, Appellant simply challenges the wisdom of the Town's decision to enact the CRO Ordinance. It is not the function of the courts to pass upon the wisdom or folly of municipal ordinances or regulations. *See McMaster,* 395 S.C. at 504–05, 719 S.E.2d at 663 ("The power to declare an ordinance invalid because it is so unreasonable as to impair or destroy constitutional rights is one which will be exercised carefully and cautiously, as it is not the function of the Court to pass upon the wisdom or expediency of municipal ordinances or regulations.").

Although a substantive due process claim is subject to a heightened burden of proof at the summary judgment stage, we find Appellant has failed to produce even a scintilla of evidence suggesting that the Town's exercise of its police power in creating the CRO district was not rationally related to the Town's legitimate long-term land-use goals. We further find Appellant has failed to present any evidence that the CRO Ordinance does not preserve existing recreational uses. To the contrary, the CRO Ordinance substantially advances those interests. In this regard, all of the evidence in the record shows the Town's planning goals will be furthered by implementing some measure of control over future golf course

conversions—namely, by requiring Town review to evaluate whether proposed development is consistent with its long-term land-use planning goals. In short, Appellant has failed to create a factual question regarding the legitimacy of the Town's objectively reasonable stated purposes. Therefore, we find summary judgment was properly granted as to Appellant's facial due process challenge. *See Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."); *Rush v. City of Greenville*, 246 S.C. 268, 281, 143 S.E.2d 527, 533 (1965) ("The financial situation or pecuniary hardship of a single owner affords no adequate grounds for putting forth this extraordinary power [of invalidating zoning restrictions] affecting other property owners as well as the public.").

## 2. As–Applied Substantive Due Process

Appellant contends the Town arbitrarily and capriciously rezoned all of the Golf Course Property to a CRO designation. We disagree, for the rezoning represents a uniform plan applicable to all golf course developments and is, in no way, inherently arbitrary.

### a. Protected Property Interest

As an initial matter, the trial court found Appellant failed to show that it possessed a vested interest in its right to construct houses on the Golf Course Property under either the common law or the Vested Rights Act.[10] Appellant now argues

---

10. The Vested Rights Act is a set of statutory provisions under which a developer may seek to protect the right to undertake and complete the development of property. *See* S.C.Code Ann. §§ 6–29–1510 to –1560 (Supp.2011). Specifically, the trial court found Appellant failed to avail itself of the provisions of the Vested Rights Act. We do not hold that, at the time the CRO Ordinance was passed, Appellant definitively had a vested right in residential development through the Vested Rights Act. We merely observe that Appellant took no action to assert any rights under the Act. This lack of action is relevant in terms of assessing whether Appellant possessed a constitutionally protected property inter-

whether its residential development rights in the Golf Course Property Land were vested at the time of the downzoning "is irrelevant to a substantive due process analysis," and claims it possesses a constitutionally protected property right by virtue of its title to the Golf Course Property.

Initially, we find Appellant's argument is not procedurally appropriate.[11] Further, because Appellant lacks a property interest in the **former** PD zoning classification, the Town's act of rezoning of the Golf Course Property did not, and could not, deprive Appellant of any right. *See Friarsgate, Inc. v. Town of Irmo*, 290 S.C. 266, 269–70, 349 S.E.2d 891, 893 (Ct.App.1986) ("[A] contemplated use of property by a landowner on the date a zoning ordinance becomes effective is not protected."). Therefore, Appellant's due process challenge fails as a matter of law. *See Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322 (4th Cir.2005) (enumerating the elements of both procedural and substantive due process claims and noting a party must show a cognizable

---

est in the context of its substantive due process claim and in evaluating Appellant's claimed investment backed expectations, as discussed below, concerning its taking claim.

11. Appellant has abandoned its previous argument—namely, that it possessed a vested development right prior to the 2006 rezoning of its property. *See Biales v. Young*, 315 S.C. 166, 168, 432 S.E.2d 482, 484 (1993) ("Failure to argue is an abandonment of the issue and precludes consideration on appeal."). Further, Appellant argues for the first time to this Court that its title to the Golf Course Property, rather than its specific right to use and develop the property, forms the requisite property interest upon which a substantive due process challenge may be based. Appellant cannot present this argument for the first time on appeal. *See Atlantic Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 330, 730 S.E.2d 282, 287 (2012) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."). Moreover, before the trial court, Appellant took the position that a vested right was required to establish a substantive due process violation. Appellant may not argue a different position on appeal. *See McLeod v. Starnes*, 396 S.C. 647, 657, 723 S.E.2d 198, 204 (2012) ("A party may not argue one ground at trial and an alternate ground on appeal."). Further, on the merits, we agree that title to land is a property interest cognizable under state law; however, we disagree that, under these facts, the CRO ordinance abrogates that interest in any way because the ordinance merely restricts the manner in which Appellant may use its property in the future and in no way affects Appellant's title to the land.

property interest as the first step under either type of claim); *Harbit,* 382 S.C. at 395, 675 S.E.2d at 782 (finding landowner lacked a property interest in having his property zoned for a particular use); *Sunset Cay,* 357 S.C. at 430, 593 S.E.2d at 470 (finding claim that city ordinance violated developer's substantive due process right failed as a matter of law where ordinance did not deprive developer of any cognizable property interest rooted in state law); *Friarsgate,* 290 S.C. at 273, 349 S.E.2d at 895 ("[A] landowner has no right to insist that his property not be restricted by a zoning regulation absent a showing that he has, prior to the effective date of the regulation, established a nonconforming use."); *see also Horne v. Mayor of Baltimore,* 349 Fed.Appx. 835, 837 (4th Cir.2009) (noting "property interests may take many forms," but "to possess a protected property interest, one 'must have more than an abstract need or desire for it or a unilateral expectation of it,' and 'must, instead, have a legitimate claim of entitlement to it.' ") (quoting *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

### b. *Arbitrary and Capricious Rezoning*

Appellant also argues that rezoning the entire area within the Golf Course Property, including the land it anticipated developing residentially, was unnecessary to further the stated purposes of the CRO Ordinance. The crux of Petitioner's complaint is that the CRO zoning boundary is arbitrary because it sweeps too broadly.

▮ We agree with the trial court that the Town's zoning boundary decision in reliance on the tax map parcels to determine zoning boundaries was not unreasonable. Indeed, the rezoning of the Golf Course Property tracts was part of a unified plan which applied to all golf courses in the Town, and the Town's use of tax map parcels as zoning district boundaries for each golf course is consistent with the stated tax-assessment purposes set forth in the CRO Ordinance. *See* Town of Mt. Pleasant, S.C., Code § 156.333(A)(1). Consequently, we reject Appellant's argument that the Town's actions in evaluating and targeting the Golf Course Property as the specific land to be rezoned were arbitrary or capricious in any way. *See Berman,* 348 U.S. at 35–36, 75 S.Ct. 98 ("It is not for the courts to oversee the choice of the boundary line

nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."); *Rucker v. Harford County,* 946 F.2d 278, 281 (4th Cir.1991) ("Irrationality and arbitrariness imply a most stringent standard against which state action is to be measured in assessing a substantive due process claim."); *Bd. of Sup'rs of Fairfax Cnty. v. Pyles,* 224 Va. 629, 300 S.E.2d 79, 84 (1983) ("Fixing the specific location of boundaries between zoning districts is a legislative function that 'is, by nature, more or less arbitrary.' " (quoting *Fairfax County v. Williams,* 216 Va. 49, 216 S.E.2d 33, 41 (1975))).

We affirm the trial court's decision to grant summary judgment in favor of the Town as to Appellant's due process claims.

## C. Takings

Appellant next claims the Town's act of downzoning the Golf Course Property amounts to an unconstitutional taking under two alternative theories: a categorical or *per se* taking under *Lucas v. South Carolina Coastal Council,*[12] and a regulatory taking under the balancing test set forth in *Penn Central Transportation Co. v. New York City.*[13] We conclude summary

---

**12.** 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In *Lucas,* a landowner purchased two residential lots on the Isle of Palms in Charleston County, South Carolina, intending to build single-family homes. Thereafter, the South Carolina General Assembly enacted the Beachfront Management Act, which prohibited construction of habitable structures on the parcels. Because the Act deprived the landowner of "all economically viable use," the United States Supreme Court found a *per se* taking occurred, and a case-specific inquiry into the public interest advanced in support of the restraint was not required *Id.* at 1015–19, 112 S.Ct. 2886.

**13.** 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *Penn Central* involved the designation of New York City's Grand Central Terminal as a historic landmark and the city preservation commission's refusal to permit landowners to construct a 50-story building over the terminal. Landowners filed suit, claiming the refusal to approve the development plans amounted to a taking and a substantive due process violation. The United States Supreme Court explained there is no "set formula" for when compensation should be made, but that the determination

judgment in favor of the Town was properly granted as to both theories, as such a determination is a question of law for the court. *See Ex Parte Brown,* 393 S.C. 214, 224, 711 S.E.2d 899, 904 (2011)("The question of a taking is one of law.").

### 1. Relevant Parcel

As an initial matter, Appellant claims the trial court erred in considering, for the purposes of its takings analysis, the relevant parcel to include all 256 acres of the Golf Course Property. Appellant argues that only the discrete portion it seeks to develop for residential use should be considered. The obstacle Appellant presents here concerning its "discrete portion" argument is that we cannot tell what that portion is. Before this lawsuit was filed Appellant presented varying acreage amounts as the affected areas of the Golf Course Property for residential development. Those varying acreage amounts ranged from 16.48 acres to 17.86 acres to 25 acres. In its complaint, Appellant asserted that "[a]pproximately 60.4 acres of the Parcels is developable land outside the areas of play of the Golf Course." Before the trial court, Appellant presented a figure of 25 acres. On appeal, Appellant's brief contains inconsistent acreage representations, ranging from 25 to 60 acres.

Before determining whether a taking has occurred, a court must first determine what, precisely, is the property at issue. *See Dist. Intown Props. v. District of Columbia,* 198 F.3d 874, 879 (D.C.Cir.1999) ("Under both *Lucas* and *Penn Central,* then, we must first define what constitutes the relevant parcel before we can evaluate the regulation's effect on

---

depends on an "essentially ad hoc, factual inquir[y]" based on the particular facts of each case based on consideration of three guiding factors: the extent to which the regulation interferes with the owner's distinct investment-backed expectations; the economic impact of the regulation; and the character of the government action. *Id.* at 124, 98 S.Ct. 2646. Based on those factors, the United States Supreme Court found no taking occurred by denying the owner's right to exploit the air space above the terminal; rather, "[t]he restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities to further enhance not only the Terminal site but also other [adjacent] properties [owned by appellants]." *Id.* at 138, 98 S.Ct. 2646.

that parcel."). "The definition of the relevant parcel profoundly influences the outcome of the takings analysis." *Id. at* 880. "Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the *denominator* of the fraction.' " *Keystone Bituminous Coal Ass'n v. Benedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

Essentially, the question is whether a court should consider a regulation's impact on only part of the property or whether a court must consider its impact upon the whole parcel. This difficult issue has been described as a "conceptual black hole." *See* Steven J. Eagle, *The Parcel and Then Some: Unity of Ownership and the Parcel As a Whole,* 36 Vt. L. Rev 549, 564 (2012) ("The takings denominator problem is more than a 'difficult, persisting question' that the [United States] Supreme Court continues to avoid.") (citing John E. Fee, *The Takings Clause As a Comparative Right,* 76 S. Cal. L.Rev. 1003, 1032 (2003)).

The United States Supreme Court has indicated several times that "piecemealing" various property interests is not permitted. *See Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 331–32, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest. Both dimensions must be considered if the interest is to be viewed in its entirety." (citation omitted)); *Keystone Bituminous Coal,* 480 U.S. at 498, 107 S.Ct. 1232 ("Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property.... [U]nder petitioners' theory one could always argue that a setback ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes."); *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) ("[T]he denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is

not a taking, because the aggregate must be viewed in its entirety."); *Penn Central*, 438 U.S. at 130–31, 98 S.Ct. 2646 (" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular government regulation has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole.").

However, other United States Supreme Court decisions have implicitly acknowledged, though never explicitly held, that "conceptual severance" of a parcel can be appropriate under the particular facts presented.[14] *See, e.g., Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (construing a public access easement as the relevant property interest separate and distinct from the parcel as a whole); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436–37, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (construing the relevant property interest to be the fee interest in the space occupied by the cable rather than the space in the building as a whole); *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (construing the relevant property interest to be the subsurface mineral and support estates rather than the complete fee estate). It has been suggested, "in order for the [United States Supreme]

14. The term "conceptual severance" is derived from "the modern notion that property is a bundle of rights made up of many strands.... [I]f you remove one or more strands from this bundle and treat them in the aggregate as a separate property interest, you are in effect conceptually severing these strands and then hypothetically or conceptually construing those strands as a separate and distinct property interest." Marc R. Lisker, *Regulatory Takings and the Denominator Problem*, 27 Rutgers L.J. 663, 695 (1996) (internal quotations omitted) (describing the various types of conceptual severance as including vertical severance (division of subsurface, surface, and air rights); temporal severance (division of property based on the time regulation is in effect and not in effect—i.e. temporary takings); functional severance (division of property interests based on easements, rights of way, and servitudes); and horizontal severance (subdivision of a parcel into smaller lots)). "It consists of delineating a property interest consisting of just what the government action has removed from the owner, and then asserting that that particular whole thing has been permanently taken." Margaret Jane Radin, *The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings*, 88 Colum. L.Rev. 1667, 1676 (1988).

Court to find that 'something' has been completely taken, the severance ... must have existed *prior to the government's action* .... That is, the appropriate understanding of what constitutes a 'parcel as a whole'—and hence the owner's 'property'—is previous real-life treatment of the resource, not the conceptual possibilities property law holds available." Margaret Jane Radin, *The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings*, 88 Colum. L.Rev. 1667, 1677 (1988).[15]

Further, the United States Supreme Court on several occasions has emphasized that the concepts of "fairness and justice," which form the basis of the takings clause, are best served by eschewing a "set formula" for determining when compensation is due. *See Lingle*, 544 U.S. at 537, 125 S.Ct. 2074 ("While scholars have offered various justifications for [the takings] regime, we have emphasized its role in 'barring Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960))); *Tahoe–Sierra*, 535 U.S. at 342, 122 S.Ct. 1465 (finding a proposed categorical rule to be "simply 'too blunt an instrument' " and concluding "the interest in 'fairness and justice' will be best served by relying on the familiar *Penn Central* approach"). Perhaps, the United States Supreme Court might find this flexibility extends to the process of determining the relevant parcel if "fairness and justice" so require. Nonetheless, this ambiguity [16] and lingering uncertainty has led some courts to

---

15. Indeed, this position is further supported by *Keystone Bituminous*, in which the United States Supreme Court found that, although the affected subsurface support estate could be recognized as a separate property interest under state law, "our takings jurisprudence forecloses reliance on such legalistic distinctions within a bundle of property rights.... Its value is merely a part of the entire bundle of rights possessed by the owner of either the coal or the surface." 480 U.S. at 500–01, 107 S.Ct. 1232.

16. In recent cases, the United States Supreme Court has declined to resolve the uncertainty and confusion involved in determining the relevant parcel based on the particular circumstances presented by each case. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 631, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (noting "[Petitioner's] contention asks us to examine the difficult, persisting question of what is the proper

stand firm in the seemingly safe refuge of the parcel-as-a-whole approach in analyzing takings claims.[17] *See, e.g., Zealy*

denominator in the takings fraction. Some of our cases indicate that the extent of the deprivation effected by a regulatory action is measured against the value of the parcel as a whole, but we have at times expressed discomfort with the logic of this rule, a sentiment echoed by some commentators," but declining to resolve the question on issue preservation grounds); *Lucas*, 505 U.S. at 1017 n. 7, 112 S.Ct. 2886 ("Regrettably, the rhetorical force of our 'deprivation of all economically feasible use' rule is greater than its precision, since the rule does not make clear the 'property interest' against which the loss of value is to be measured.... Unsurprisingly, this uncertainty regarding the composition of the denominator in our 'deprivation' fraction has produced inconsistent pronouncements by the Court.").

17. However, other courts have found United States Supreme Court jurisprudence to be more nuanced and concluded that "[t]he effort should be to identify the parcel as realistically and fairly as possible, given the entire factual and regulatory environment." *Ciampitti v. United States*, 22 Cl.Ct. 310, 318–19 (1991) ("Factors such as the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others would enter the calculus."). *Accord Dist. Intown Props.*, 198 F.3d at 880 (noting that "[a]bove all, the parcel should be functionally coherent," and finding relevant factors to be "the degree of continuity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, and the extent to which the restricted lots benefit the unregulated lot[s]"); *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed.Cir.1999) ("With regard to the relevant parcel, our precedent displays a flexible approach, designed to account for factual nuances.... Where the developer treats legally separate parcels as a single economic unit, together they may constitute the relevant parcel."); *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1181 (1994) (rejecting a bright-line rule to define the relevant property in the context of a takings challenge and employing a "flexible approach, designed to account for factual nuances"); *Giovanella v. Conserv. Comm'n of Ashland*, 447 Mass. 720, 857 N.E.2d 451, 457–58 (2006) (finding "the extent of contiguous commonly-owned property gives rise to a rebuttable presumption defining the relevant parcel" which may be overcome to either increase or decrease the size of the parcel by the application of various factors including whether the property is divided by a road; whether the property was acquired at the same time; whether the purchase and financing of parcels were linked; the timing of development; whether the land is put to the same use or different uses; whether the owner intended to or actually did use the property as one economic unit; and the treatment of the property under state law); *Quirk v. Town of New Boston*, 140 N.H. 124, 663 A.2d 1328, 1332–33 (1995) (noting the relevant property may be a discrete portion of a larger tract where the landowner has fragmented the property into distinct segments before the regulatory environment existed or where

*v. City of Waukesha*, 201 Wis.2d 365, 548 N.W.2d 528, 532 (1996) ("[T]he United States Supreme Court has never endorsed a test that 'segments' a contiguous property to determine the relevant parcel.") (citing *Penn Central*, 438 U.S. at 130, 98 S.Ct. 2646).

We need not attempt to untangle this Gordian Knot today, for even if we were persuaded that it may be appropriate, under the proper circumstances, to consider the relevant parcel as something less than the whole, this is not such a case.

The trial court determined the relevant parcel included the entire area within the Golf Course Property. Specifically, the trial court found:

> From their initial development, these parcels have been used as a unit, as a golf course. [Appellant] did not set out to purchase just the Claimed Developable Lands. It purchased all the tracts and created a separate corporate entity with a title having a golf emphasis, i.e. "Dunes West Golf Club, LLC," to own them. It used the tracts as a golf course and did not ... pursue residential development on the tracts. It mortgaged the tracts as a unit. These facts compel but one conclusion: the relevant parcel [is] the six tracts [of 256 acres], not fragments of them.

Appellant's moving-target approach and inability to consistently identify a discrete acreage for residential development precludes us from delineating with any precision the specific segments of land Appellant contends comprise the relevant parcel. Because of Appellant's ever-changing approach as to the portion of the Golf Course Property it seeks to develop, we are left with no choice but to uphold the trial court's parcel-as-a-whole approach. *See United States v. Causby*, 328 U.S. 256, 267–68, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (stating "an accurate description of the property taken is essential" and, in the absence of a precise description, refusing to identify the relevant property through "conjecture rather than a conclusion from the evidence"); *Cothran v. Brown*, 357 S.C. 210,

---

portions of the larger tract have already been dedicated to benefit the public but finding no compelling reason to view a single parcel as discrete segments where the landowner had never treated the affected area as distinct from the unaffected portion of the property).

217–19, 592 S.E.2d 629, 633 (2004) (noting that a party cannot take inconsistent positions in an attempt to create a sham issue of material fact).

Further, even assuming Appellant had consistently identified a particular segment, Appellant has failed to posit any fact suggesting that a portion of the Golf Course Property would be appropriately viewed as a discrete segment, either under the factors other courts have considered or any other factor which might be fit to consider in this situation. To the contrary, everything in the record suggests the Golf Course Property is most appropriately viewed as a single unit.

In short, Appellant merely entreats this Court to conceptually subdivide the Golf Course Property and identify the relevant parcel in terms of the area of land it claims was taken by the CRO Ordinance. We are compelled to reject Appellant's argument because the United States Supreme Court has consistently refused to separate an owner's property into a portion which is impacted by the challenged regulation and a portion which is not, and define the relevant parcel as including only the former. *See, e.g., Tahoe–Sierra,* 535 U.S. at 331, 122 S.Ct. 1465 ("[D]efining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, every [regulation] . . . would constitute [a] categorical taking[ ]."); *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 643, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("[A] claimant's parcel of property c[an] not be first divided into what was taken and what was left for the purposes of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question."). Were we to accept Appellant's argument, potential claimants could construe virtually any land-use control (such as a setback requirement) as amounting to a taking by defining the relevant parcel as only the area affected by the regulation (i.e. the area between the lot line and the building line in which the owner is not permitted to build). *See Beard v. S.C. Coastal Council,* 304 S.C. 205, 207–08, 403 S.E.2d 620, 622 (1991) (finding denial of a permit application to build a bulkhead on beachfront property did not constitute a taking

and refusing to define the relevant parcel as consisting of only that portion of the beach critical area in which the landowners wished to construct an extension of the existing bulkhead).

We conclude the trial court did not err by finding the evidence supports but one reasonable inference—the entire 256–acre area within the Golf Course Property constitutes the relevant parcel in this analysis. Having established the parameters of the property at issue, we turn now to Appellant's takings claim.

### 2. Takings

■ The Takings Clause of the Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "The Fifth Amendment, which requires just compensation where private property is taken for public use, undertakes to redistribute certain economic losses inflicted by public improvements so that they will fall upon the public rather than wholly upon those who happen to lie in the path of the project." *United States v. Willow River Power Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 89 L.Ed. 1101 (1945). "It does not undertake, however, to socialize all losses, but those only which result from a taking of property." *Id.* "If damages from any other cause are to be absorbed by the public, they must be assumed by act of Congress and may not be awarded by the courts merely by implication from the constitutional provision." *Id.*

■ "As its text makes plain, the Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *Lingle,* 544 U.S. at 536, 125 S.Ct. 2074. "In other words, it is designed not to limit the governmental interference with property rights *per se,* but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *Id.* at 536–37, 125 S.Ct. 2074. "Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Mahon,* 260 U.S. at 413, 43 S.Ct. 158. "The general rule is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415, 43 S.Ct. 158. "The rub, of course, has been—and

remains—how to discern how far is 'too far.' " *Lingle*, 544 U.S. at 538, 125 S.Ct. 2074.

We acknowledge, as the United States Supreme Court has stated, that "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Central*, 438 U.S. at 123, 98 S.Ct. 2646. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle*, 544 U.S. at 537, 125 S.Ct. 2074. However, even absent a direct physical invasion, "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Id.* at 538, 125 S.Ct. 2074.

*a. Categorical Taking*

We first address the *Lucas* categorical taking. According to Appellant, because certain areas of the Golf Course Property could have been used for residential development prior to the 2006 rezoning, and by precluding that development, the rezoning eliminated all economically beneficial use of the claimed developable land. We disagree.

Government regulation effectuates a *per se* taking in two scenarios: (1) where an owner is required to suffer a permanent physical invasion of property, however minor, (finding a law requiring landlords to allow television cable companies to install equipment, which occupied only about 1.5 cubic feet of property, in their apartment buildings amounted to a taking); or (2) "where [a] regulation denies all economically beneficial or productive use of land." *See Lucas*, 505 U.S. at 1015–16, 112 S.Ct. 2886 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436–37, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)).

There is no dispute that this case does not involve a physical invasion of Appellant's property. Thus, the only issue is whether the CRO Ordinance deprived Appellant of "all economically beneficial uses" of its land, and therefore, amounted to a taking. *See id.* at 1019, 112 S.Ct. 2886. On these facts, we find there was no categorical taking because the CRO

designation permits numerous recreation and conservation uses, and Appellant has failed to produce any evidence that those permitted uses are not economically beneficial. Indeed, everything in the record demonstrates the Dunes West Golf Club generates a positive cash flow and is more profitable than Weiland's other golf courses. Appellant has presented no evidence that this is the "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886. Thus, we find the trial court properly granted summary judgment in favor of the Town as to Appellant's categorical taking claim.

Although we find no categorical taking has occurred, the law provides that where limitations on land fall short of eliminating all economically beneficial use, a regulatory taking still may have occurred depending on a complex set of factors. Thus, we turn to Appellant's regulatory taking claim and analyze each of the relevant factors in turn.

### b. Penn Central *Balancing Test*

 As noted above, in the regulatory taking context, the issue of whether a taking occurred is a question of law for the Court. *See Carolina Chloride,* 394 S.C. 154, 171, 714 S.E.2d 869, 877 (2011) ("In an inverse condemnation case, the trial judge will determine whether a claim has been established."); *Ex Parte Brown,* 393 S.C. at 224, 711 S.E.2d at 904 ("The question of a taking is one of law.").

 Aside from scenarios involving a permanent physical invasion or a *Lucas*-type categorical taking, "regulatory takings challenges are governed by the standards set forth in *Penn Central.*" *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074; *see also Byrd v. City of Hartsville,* 365 S.C. 650, 658, 620 S.E.2d 76, 80 (2005) (finding that an inverse condemnation claim involving denial of less than all economically viable use is governed by *Penn Central*). The "common touchstone" of each regulatory taking theory is "to identify *regulatory actions that are functionally equivalent to the classic taking* in which government directly appropriates private property or ousts the owner from his domain." *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074 (emphasis added). However, the United States Supreme Court repeatedly has declined to identify a specific

threshold of interference with property rights below which no taking occurs and above which there is a taking. *See, e.g., Tahoe–Sierra,* 535 U.S. at 332–35, 122 S.Ct. 1465 (holding that determining whether a regulatory taking has occurred is not best served by categorical rules but rather "requires careful examination and weighing of all the relevant circumstances"). In this case, the CRO Ordinance falls clearly in the category of a regulatory action that is not the functional equivalent of a classic taking.

 *Penn Central,* as clarified by *Lingle,* provides a navigable framework for resolving regulatory takings claims distinct from the substantive due process inquiry. Noting that these constitutional challenges present "essentially ad hoc" inquiries which are largely dependent on the particular circumstances of each case, *Penn Central* identifies the appropriate factors to consider in determining whether a taking has occurred: the character of the government action, the economic impact of the regulation on the claimant, and the extent to which the regulation has interfered with distinct investment-backed expectations. 438 U.S. at 124, 98 S.Ct. 2646. Having carefully examined the *Penn Central* factors, we find Appellant's regulatory takings claim falls short.

Concerning the character of the government action, "In answering [the takings] question, we must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good'...." *Lingle,* 544 U.S. at 538, 125 S.Ct. 2074 (quoting *Andrus,* 444 U.S. at 65, 100 S.Ct. 318). The United States Supreme Court has recognized, "in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values." *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. "[T]he 'Fifth Amendment's guarantee is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.* at 123, 98 S.Ct. 2646 (quoting *Armstrong,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). However, the United States Supreme Court "quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government rather than

remain disproportionately concentrated on a few persons." *Id.* at 124, 98 S.Ct. 2646.

" 'Not all damages suffered by a private property owner at the hands of [a] governmental agency are compensable.' " *Carolina Chloride,* 394 S.C. at 170, 714 S.E.2d at 877 (quoting *Woods v. State,* 314 S.C. 501, 504, 431 S.E.2d 260, 262 (Ct.App.1993)). Indeed, "[u]nder our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property." *Keystone Bituminous,* 480 U.S. at 491, 107 S.Ct. 1232. "While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Id.*

"[W]hile most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of 'the advantage of living and doing business in a civilized community,' some are so substantial and unforeseeable, and can so easily be identified and redistributed, that 'justice and fairness' require that they be borne by the public as a whole." *Kirby Forest Indust. v. United States,* 467 U.S. 1, 14, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (quoting *Andrus,* 444 U.S. at 67, 100 S.Ct. 318).

Here, in examining the character of the Town's actions, the trial court found:

> The CRO Ordinance is bottomed on legitimate, land use considerations. Preservation of open space and recreational opportunities, flood prevention and curbing ill effects of indiscriminate golf course conversions are all proper zoning considerations.

The CRO Ordinance was applied to all golf course properties in the Town. The Town has provided legitimate and substantial public purposes sought to be achieved by the enactment of the comprehensive CRO Ordinance, and the Town's land-use ordinances permit a landowner to seek rezoning of a golf course, as was done here, in the event the landowner wishes to undertake residential development.

As noted above, the CRO Ordinance has not eliminated all development potential—there are still some (albeit a reduced number of) permitted uses which would allow further development under the CRO zoning designation. Nor did the Town

abridge Appellant's presently existing use of the Golf Course Property or the right to sell the land if it wishes. Rather, we find the evidence in the record shows that the rezoning did not disadvantage Appellant in a constitutionally significant way. Indeed, the CRO restrictions are applicable to all golf courses throughout the Town, and the Town has not in any way exploited the Golf Course Property for its own use or to gain any economic advantage. Rather, the CRO Ordinance merely preserves existing golf courses, all of which were designated as open space by the Town's Comprehensive Plan prior to its enactment.

Furthermore, the CRO Ordinance is not a permanent and immutable prohibition against residential use; rather, the CRO Ordinance represents the implementation of a controlled process through which the Town may *evaluate* future use conversion and ensure existing recreational uses are not abrogated or converted in an inappropriate manner. As such, the CRO Ordinance provides a "clear reciprocity of advantage because it protects the interest of all affected landowners against immediate construction that might be inconsistent" with the Town's land-use planning goals. *Tahoe–Sierra*, 535 U.S. at 341, 122 S.Ct. 1465.

In sum, it cannot be said that, by designating the Golf Course Property as a CRO district, the Town has taken or acquired Appellant's property. Accordingly, we conclude this factor weighs in the Town's favor.

 As for the economic impact of the CRO Ordinance, United States Supreme Court decisions sustaining land-use regulations "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking,' and that the 'taking' issue in these contexts is resolved by focusing on the uses the regulations permit." *Penn Central*, 438 U.S. at 131, 98 S.Ct. 2646 (citations omitted). "Although a comparison of values before and after a regulatory action is relevant, it is by no means conclusive." *Keystone Bituminous*, 480 U.S. at 490, 107 S.Ct. 1232. "[T]he extent of diminution [in value] is but 'one fact for consideration' in determining whether governmental action constitutes a taking." *Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 713 (3rd Cir.1985).

Construing the facts in the light most favorable to Appellant, the market value of the Golf Course Property may have decreased after the CRO Ordinance was enacted; however, balanced against the legitimate public purposes of the CRO Ordinance, the impact of the rezoning is not the functional equivalent of a physical taking. *See Kirby Forest,* 467 U.S. at 15, 104 S.Ct. 2187 ("[I]mpairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking."). The evidence in the record establishes that, in 2005, Appellant believed the purchase price of $4 million was a fair price for the course itself, and at the time of purchase, it considered any development value of the surrounding acreage to be "a gift" which was not reflected in the purchase price.[18] The evidence in the record further establishes the Golf Course Property retained at least $3.5 million in value for use as a golf course even after the rezoning and that the decline in value was due to the poor economy.[19] Even assuming, in the light most favorable to Appellant, that the CRO Ordinance was the direct and immediate cause of any diminution in value, all of the evidence shows the Golf Course Property nonetheless retained significant value after the rezoning. Existing jurisprudence uniformly rejects the proposition that a diminution in property value, standing alone, can establish a taking. *See Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87.5% diminution in value caused by zoning law); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution in value). Thus, we find any change in market value of the Golf Course Property is merely an incident of ownership that is not compensable under the Fifth Amendment. *See Causby,* 328 U.S. at 266–67, 66 S.Ct. 1062 (noting that most "inconveniences" which are "part of the modern environment of life" are not normally compensable

---

**18.** This evidence is the deposition testimony of Kevin Popson, Appellant's Rule 30(b)(6), SCRCP, witness as to general matters.

**19.** This evidence is the deposition testimony of J.T. McMickle, Appellant's Rule 30(b)(6), SCRCP, witness as to financial matters. Although the record also contains several appraisals valuing the Golf Course Property at $3,798,000, $3,840,000, and $4,900,000, our analysis is based on a valuation of $3,500,000, which is the lowest figure and the one most favorable to Appellant.

under the Fifth Amendment); *Sunrise Corp.*, 420 F.3d at 330 (noting fluctuations in property value are almost always incidents of ownership that are not properly considered a taking); *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 786 (8th Cir.1979) (finding that redevelopment ordinances, "even if they result in a decline in property values, do not constitute a taking requiring compensation to the property owner").

Lastly, the factor concerning Appellant's investment backed expectations militates against Appellant. "[C]ontinuation of the existing use of the property is the property owner's 'primary expectation' when considering an owner's investment-backed expectations for the property." *See Carolina Chloride*, 394 S.C. at 173, 714 S.E.2d at 878 (quoting *Byrd*, 365 S.C. at 662, 620 S.E.2d at 82). Further, "[a] 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). All of the evidence in the record shows the only use to which the Golf Course Property has ever been put is a golf course. As such, continued use as a golf course is necessarily Appellant's primary expectation, which was not impaired in any way by the enactment of the CRO Ordinance; rather, the CRO Ordinance was designed specifically to preserve that existing use. Moreover, Appellant has failed to produce any evidence showing its "expectations" were reasonable or investment-backed.

In acquiring the valuable Golf Course Property, Appellant only casually approached the idea of converting a portion of the property to residential development and never submitted any formal development plan or subdivision plat to the Town in furtherance of its abstract desire. Further, Weiland did not investigate, prior to purchase or anytime thereafter, the feasibility of the desired development—thus, it is clear Appellant's unilateral development expectations did not take into account the wetlands, easements, or substantial changes to the golf course that would be required. Moreover, there is no evidence that the Town took any action or made any representation which served to increase Appellant's expectations or led

Appellant to believe that residential use would be forthcoming. To the contrary, Weiland knew, before purchasing the Golf Course Property, that public sentiment regarding any residential development would be a factor in its approval, notwithstanding the prior PD zoning designation. Next, the Vested Rights Act presented a potential opportunity to achieve the goal of residential development Appellant now seeks, yet Appellant offers no explanation for letting the opportunity pass without even attempting to avail itself of that prospect.

Further, as to the investment-backed aspect, the record is devoid of any evidence showing Appellant substantially relied or materially altered its position based on the prior PD zoning or its desire to develop residentially a portion of the Golf Course Property. Although Appellant claims significant expenditures were made, none of those expenditures were in furtherance of residential development; rather, all of the evidence in the record shows money spent in furtherance of the existing recreational use of the Golf Course Property.[20] Although the record shows Appellant prepared preliminary projection of costs and revenues associated with residential development of the Golf Course Property, there is no evidence that any of those expenditures were *actually* incurred. Indeed, the only objective, overt act appearing in the record is Appellant's informal identification of potential future home sites, and to the extent any costs were incurred during that process, Appellant failed to submit any such evidence.

For government regulation to constitute a taking, the property owner must objectively demonstrate the existence investment-backed expectations. Therefore, Appellant's effort to elevate its anticipated development prospects to the level of tangible, investment-backed expectations is unavailing. Appellant has failed to show any concrete steps taken in furtherance of prospective residential development. Rather, we are

---

**20.** The record includes an itemized list of Appellant's expenditures for the period of time between 2005 and 2009; however, none of these expenditures was in furtherance of residential development. Rather, the bulk of expenditures related to maintenance and renovation of the clubhouse (i.e. the installation of various new lighting fixtures and new tile and carpet) and acquisition of new equipment for golf course operations (i.e. the purchase of 77 golf carts and various pieces of landscaping equipment), with a small portion being devoted to purchasing office supplies (i.e. a Xerox copy machine and several computers).

presented with a unilateral expectation unsupported by the kind of solid evidence necessary to establish a regulatory taking. This lack of evidence is perhaps best illustrated by Appellant's ever-changing approach in identifying what portion of the Golf Course Property it wants to develop. *See Causby,* 328 U.S. at 267–68, 66 S.Ct. 1062 (stating "an accurate description of the property taken is essential" and, in the absence of a precise description, refusing to identify the relevant property through "conjecture rather than a conclusion from the evidence"); *Cothran,* 357 S.C. at 217–19, 592 S.E.2d at 633 (noting that a party cannot take inconsistent positions in an attempt to create a sham issue of material fact).

In short, the 256–acre Golf Course Property remains a valuable property, not only as a golf course, but also for other, related uses permitted by the CRO designation. Appellant is essentially left to argue that its takings claim is founded upon only its inability to exploit certain portions of the Golf Course Property for residential development. As the *Penn Central* Court noted, "the submission that appellants may establish a taking simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." *Penn Central,* 438 U.S. at 130, 98 S.Ct. 2646.

We reject Appellant's regulatory taking claim. In sum, we find the Town was legitimately concerned about the possibility that golf courses could be converted to residential use without any land-use oversight, and in response to those concerns, the Town simply "adjust[ed] the benefits and burdens of economic life to promote the common good" in a way that incidentally impacted Appellant's ability to maximize the profit from the development of its land. *Id.* at 124, 98 S.Ct. 2646.

### IV.

For the foregoing reasons, we affirm the circuit court's grant of summary judgment in favor of the Town.

**AFFIRMED.**

PLEICONES, Acting Chief Justice, BEATTY, HEARN, JJ., and Acting Justice JAMES E. MOORE, concur.