# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The Gulfstream Café, Inc. Appellant,

v.

Georgetown County; Georgetown County Council; and Steve Goggans, individually and in his official capacity as Georgetown County Councilmember, Respondents.

Appellate Case No. 2023-000646

———

Appeal from Georgetown County
R. Kirk Griffin, Circuit Court Judge

———

Opinion No. 28303
Heard November 13, 2024 – Filed October 29, 2025

———

**AFFIRMED**

———

Sean Matthew Foerster, of Rogers Townsend LLC, of Columbia; Simon H. Bloom, Andrea J. Pearson, and Adam D. Nugent, all of Bloom Parham LLC, of Atlanta, GA, all for Appellant.

Henrietta U. Golding, of Burr & Forman LLP, of Myrtle Beach, for Respondents.

———

**JUSTICE JAMES:** This zoning/inverse condemnation case revolves around the availability of parking in the Marlin Quay Planned Development (the PD) in

Georgetown County. Gulfstream Café, Inc., which owns a restaurant in the PD, sued Georgetown County; Georgetown County Council; and Steve Goggans, individually and in his official capacity as Georgetown County Councilmember (Respondents), alleging Council's adoption of an ordinance allowing the construction of a new restaurant in the PD was unlawful and infringed upon its easement rights over a shared parking lot. The circuit court ruled in favor of Respondents on all claims. We affirm.

## BACKGROUND

County Council created the PD in 1982. The PD originally included two buildings—the Gulfstream Café and the Marlin Quay Marina, the latter of which housed a restaurant and a marina store that served a sixty-slip marina. Marlin Quay Marina Corporation owned the Marlin Quay Marina and also owned sixty-two parking spaces in the parking lot situated in the PD. Gulfstream owns seventeen spaces of its own. In 1986, Marlin Quay Marina Corporation granted Gulfstream an easement giving Gulfstream the right of ingress and egress to and from the parking lot and allowing Gulfstream the nonexclusive use of its sixty-two spaces. The easement also provides "[i]t is anticipated by the parties that while they will each have joint and non-exclusive use of the area covered by this easement that the Grantor will primarily utilize the premises during the daytime and [Gulfstream] will primarily use these premises in the evening." There is no dispute that parking spaces for Gulfstream patrons were significantly limited even before this dispute arose.

Throughout the next thirty years, patrons of Marlin Quay Marina typically visited the marina store and restaurant during daytime hours. Throughout Gulfstream's existence, its patrons have typically visited Gulfstream during the evening hours. However, things changed in 2016, when Palmetto Industrial Development, LLC (Palmetto) purchased Marlin Quay Marina and the parking lot, subject of course to Gulfstream's nonexclusive easement. Palmetto demolished the marina store and restaurant and hired SGA Architecture to prepare plans for a new restaurant. Respondent Goggans, a principal in SGA and the lead architect on the project, was also a member of County Council at the time.

From 2016 to 2019, Palmetto submitted three different versions of its building plans for Council's approval (hereinafter, "1.0," "2.0," and "3.0"). Council approved 1.0. However, construction did not go forward because Palmetto submitted the application as a minor amendment to the PD instead of as a major amendment. Gulfstream filed a complaint with the South Carolina Ethics Commission against

Steve Goggans, alleging he had a conflict of interest arising from his status as a member of Council. The Ethics Commission reprimanded and fined Goggans. Goggans then removed himself from the project and recused himself from further Council decisions regarding the potential new restaurant and amendments to the PD.

Palmetto next submitted plan 2.0 to Council. The only difference between 1.0 and 2.0 was that Palmetto submitted 2.0 as a major amendment to the PD, rather than as a minor amendment. Council approved 2.0, with Goggans recusing. Gulfstream then sued Palmetto, alleging 2.0 would interfere with its easement rights. A jury returned a verdict for Gulfstream, and the circuit court ruled that any future project must be confined to the footprint of the original marina store and restaurant.

Palmetto next submitted plan 3.0. The only differences between 2.0 and 3.0 were (1) the footprint of the new building would now fit in the footprint of the old building, as ordered by the circuit court, and (2) the height of the new building would not exceed forty-seven feet. Council approved 3.0, which became Ordinance 2018-40. Construction was completed, and the new restaurant, The Quay, has a seating capacity of 110 patrons in 4,596 heated square feet. This seating capacity is the same as that of the former establishment, but The Quay can also accommodate unseated patrons outside the heated square footage area. Also, The Quay has attracted additional patrons to the PD during the evening hours, which has resulted in parking that was already scarce to become scarcer. Gulfstream contends this has had a devastating impact on its business, thus causing a drastic diminution in the value of its property.

Gulfstream sued Respondents, alleging Ordinance 2018-40 allows construction of a building that will result in the overburdening of the parking lot over which Gulfstream has an easement. Gulfstream asserts (1) Ordinance 2018-40 (plan 3.0) violates its substantive due process rights, (2) Ordinance 2018-40 constitutes a taking and inverse condemnation, (3) Ordinance 2018-40 should be invalidated because of Goggans' involvement with 1.0, and (4) a violation of procedural due process. After a four-day bench trial, the circuit court ruled in favor of Respondents on all claims. Gulfstream appealed.

## STANDARD OF REVIEW

"In an action at law tried without a jury, an appellate court's scope of review extends merely to the correction of errors of law." *Temple v. Tec-Fab, Inc.*, 381 S.C. 597, 599-600, 675 S.E.2d 414, 415 (2009). "This Court will not disturb the trial

court's factual findings unless they are without evidence reasonably supporting those findings." *S.C. Dep't of Transp. v. Horry Cnty.*, 391 S.C. 76, 81, 705 S.E.2d 21, 24 (2011). The circuit court's legal and constitutional conclusions are reviewed de novo. *Owens v. Stirling*, 443 S.C. 246, 264, 904 S.E.2d 580, 589 (2024).

## DISCUSSION

### I. Substantive Due Process

Gulfstream argues the circuit court erred in ruling Ordinance 2018-40 did not violate its substantive due process rights. We disagree.

#### A. Applicable Law

To prevail on its substantive due process claim, Gulfstream must prove "(1) that [it] had property or a property interest; (2) that the state deprived [it] of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005) (quoting *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 827 (4th Cir. 1995)). For the third element, the challenging party "must show that he was arbitrarily and capriciously deprived of a cognizable property interest rooted in state law." *Dunes W. Golf Club, LLC v. Town of Mount Pleasant*, 401 S.C. 280, 296, 737 S.E.2d 601, 609 (2013) (quoting *Harbit v. City of Charleston*, 382 S.C. 383, 394, 675 S.E.2d 776, 782 (Ct. App. 2009)). This is essentially a rational basis review, as we consider "whether the ordinance bears a reasonable relationship to any legitimate interest of government." *Dunes W. Golf Club*, 401 S.C. at 296, 737 S.E.2d at 609 (quoting *McMaster v. Columbia Bd. of Zoning Appeals*, 395 S.C. 499, 505, 719 S.E.2d 660, 663 (2011)). There is a presumption in favor of the constitutionality of the ordinance. *McMaster*, 395 S.C. at 504, 719 S.E.2d at 662.

"It is not the function of the courts to pass upon the wisdom or folly of municipal ordinances or regulations." *Dunes W. Golf Club*, 401 S.C. at 300, 737 S.E.2d at 611. "Courts cannot become city planners but can only correct injustices when they are clearly shown to result from the municipal action." *Knowles v. City of Aiken*, 305 S.C. 219, 222, 407 S.E.2d 639, 642 (1991) (quoting *Talbot v. Myrtle Beach Bd. of Adjustment*, 222 S.C. 165, 175, 72 S.E.2d 66, 70 (1952)).

**B. Analysis**

**1. Gulfstream has a property right, albeit a limited one.**

The 1986 easement provides Gulfstream with the right of ingress and egress into the parking lot, along with a limited property right in the form of "joint and non-exclusive use" of the parking lot and its sixty-two parking spaces: "[i]t is anticipated by the parties that while they will each have joint and non-exclusive use of the area covered by this easement that the Grantor will primarily utilize the premises during the daytime and the Grantee [Gulfstream] will primarily use these premises in the evening." Since the creation of the PD in 1982, one space was lost when the fire department placed an FDC (water connection point) and an electrical box in the space. Otherwise, the size of the lot and the number of spaces have remained the same.

Though the parties have operated under this shared approach for almost 40 years, Gulfstream argues it has exclusive use of all spaces in the entire parking lot during evening hours. We disagree. The clear limitations in the easement establish Gulfstream has never had a reasonable expectation that its easement rights are anything other than nonexclusive.

**2. Gulfstream has not been deprived of its nonexclusive property right.**

The presence of the new restaurant does not deprive Gulfstream of its nonexclusive property right. Gulfstream has the same right it had when the easement was conveyed to it in 1986—the right of ingress and egress to and from the parking lot and the nonexclusive right to use the parking spaces. For that reason alone, Gulfstream's substantive due process claim fails.

**3. There is a rational basis for the County's action.**

Gulfstream argues Ordinance 2018-40 is unlawful because the new restaurant makes the PD noncompliant with the parking standards in Article XI of Georgetown County's zoning ordinance. We disagree, as compliance with Article XI is not required.

Planned development districts operate as amendments to locally adopted zoning ordinances "[i]n order to achieve the objectives of the comprehensive plan of the locality and to allow flexibility in development that will result in improved

design, character, and quality of new mixed use developments and preserve natural and scenic features of open spaces . . . ." S.C. Code Ann. § 6-29-740 (2004). The PD map is the zoning district map for the property, and PD provisions "must encourage *innovative site planning* for residential, commercial, institutional, and industrial developments within planned development districts." *Id.* (emphasis added). "Planned development districts may provide for *variations from other ordinances and the regulations* of other established zoning districts concerning use, setbacks, lot size, density, bulk, and other requirements to accommodate flexibility in the arrangement of uses for the general purpose of promoting and protecting the public health, safety, and general welfare." *Id.* (emphasis added). Thus, PDs provide local governments with the flexibility to be innovative in site planning because strict compliance with local zoning ordinances is not required. This flexibility extends to parking issues.

Article XI of the county zoning ordinance contains off-street parking regulations for Georgetown County. Under Article XI, if there is more than one principal use of a parking lot, the total number of spaces must equal the sum of the required spaces for each use of the parking lot calculated separately. Restaurants must have one parking space per 100 square feet of gross floor area plus one space per 150 square feet of outdoor seating area.

If Article XI were applied to this PD, there would be a shortage of 108 parking spaces in the lot. However, section 6-29-740 provides that strict compliance with zoning regulations, including those related to parking, is not required in PDs. Here, the County decided to use Article XI as a guide in establishing parking requirements for this PD and calculated the parking requirements for the new restaurant by using only heated square footage of the new restaurant. Further, the County decided not to consider the other uses of the parking lot in its calculation.

Gulfstream points to emails in which Georgetown County planning staff referenced parking "requirements" and parking calculations. These discussions reflect staff used Article XI merely as a guide for parking requirements in the PD, based on the limited parking that has existed for the life of the PD. Again, compliance with Article XI was not mandatory.

We note parking in the PD has never complied with Article XI—not when Gulfstream was built and first shared the parking lot with the original marina store and restaurant, not after the demolition of the marina store and restaurant, and not with the construction of the new restaurant. This noncompliance has always been

immaterial, because Article VI provides the requirements for PDs in Georgetown County. Section 619.601 of Article VI states the conceptual plan for the PD shall contain parking when applicable. The conceptual plan for this PD does not include specific parking requirements; it includes only the number of parking spots available in the PD at the time it was created. Gulfstream argues the County must apply Article XI parking requirements because the conceptual plan does not include guidance for parking requirements. We disagree. As stated in section 6-29-740, a PD involves "innovative site planning," and it may vary from ordinances and regulations "to accommodate the flexibility in the arrangement of uses."

The County had the discretion to formulate a parking plan furthering the objectives of the PD. The County's decision to use only the heated square footage of the new restaurant to calculate the number of parking spaces needed may or may not have been the best decision. However, a court's role is not to challenge the wisdom of the County's decision or become a city planner when the County makes an arguably poor decision. We may only correct injustices that result from government action when no rational basis can be shown. *See Knowles*, 305 S.C. at 222, 407 S.E.2d at 642. After providing required notice, hearing public comment and debate, and considering 3.0, Council approved a safer building compliant with modern code regulations. Council also limited the new building's seating capacity to that of the former building to limit the burden on the parking lot.

The circuit court did not err in rejecting Gulfstream's substantive due process claim.

## II. Taking and Inverse Condemnation

Gulfstream argues Ordinance 2018-40 constitutes both a taking and inverse condemnation. We disagree.

### A. Applicable Law

Government regulation amounts to a per se taking when (1) the owner "suffer[s] a permanent physical invasion of property," and (2) a "regulation denies all economically beneficial or productive use of land." *Dunes W. Golf Club*, 401 S.C. at 313, 737 S.E.2d at 619 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992)). This case concerns the latter. "[W]here limitations on land fall short of eliminating all economically beneficial use, a regulatory taking still may have occurred depending on a complex set of factors." *Id.* at 314, 737 S.E.2d at 619.

The *Penn Central* test governs cases in which property owners have not been denied all economically viable use of their land. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978); *see Byrd v. City of Hartsville*, 365 S.C. 650, 658, 620 S.E.2d 76, 80 (2005). The *Penn Central* test evaluates (1) the character of the government action, (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation has interfered with distinct investment-backed expectations. 438 U.S. at 124.

## B. Analysis

### 1. A per se taking has not occurred.

This Court has denied per se taking claims when the Appellant failed to show an "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Dunes W. Golf Club*, 401 S.C. at 314, 737 S.E.2d at 619 (quoting *Lucas*, 505 U.S. at 1017).

Gulfstream has not been deprived of all economically beneficial or productive use of its easement, because it retains its right of ingress and egress to and from the parking lot, as well as its nonexclusive use of the parking spaces. There is no evidence Ordinance 2018-40 completely prevents Gulfstream from operating its restaurant. Gulfstream's expert testified the restaurant would be worth only $89,900 as a result of Ordinance 2018-40. However, the expert testified this value was based on his "extraordinary assumption" that Ordinance 2018-40 would result in the loss of *all* parking. Gulfstream has not lost access to all parking, even if its customers may experience an increased difficulty in finding parking. Gulfstream still has nonexclusive use of sixty-two spaces in the PD, and it still owns seventeen spaces of its own. Also, Gulfstream's expert did not consider the number of customers who may travel by foot, charter bus, and ride-sharing services to the restaurant. In sum, Gulfstream still has an economically beneficial use of its property.

### 2. A regulatory taking has not occurred.

The circuit court properly applied the *Penn Central* test to determine Ordinance 2018-40 did not constitute a regulatory taking.

First, the character of the government action in this case weighs against a finding of a regulatory taking. "[G]overnment regulation—by definition—involves the adjustment of rights for the public good." *Dunes W. Golf Club*, 401 S.C. at 315,

737 S.E.2d at 620 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (citation modified)). In *Dunes West*, we recognized "[p]reservation of open space and recreational opportunities, flood prevention and curbing ill effects of indiscriminate golf course conversions" as legitimate land use concerns. *Id.* at 316, 737 S.E.2d at 620. We held there was no taking when the ordinance at issue did not eliminate all development potential, or "abridge [the landowner's] presently existing use of the [land] or the right to sell the land if it wishes." *Id.* at 317, 727 S.E.2d at 620. Further, we found the government did not exploit the property for its own use or to gain any economic advantage. *Id.*

Here, the County advanced legitimate land use concerns in approving a safer building that complied with modern day building and fire codes. Also, the new restaurant will service the growing tourist population in Garden City. Additionally, the "adjustment of rights" in this case is minimal. Gulfstream is still able to operate its restaurant and enjoy its nonexclusive easement, and there is also no evidence the County is exploiting the parking lot for its own use or economic advantage. Therefore, we hold the character of the government action weighs against a regulatory taking.

Second, the economic impact of Ordinance 2018-40 on Gulfstream weighs against a finding of a regulatory taking. As we noted in *Dunes West*,

> United States Supreme Court decisions sustaining land-use regulations "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking,' and that the 'taking' issue in these contexts is resolved by focusing on the uses the regulations permit." *Penn Central*, 438 U.S. at 131. "Although a comparison of values before and after a regulatory action is relevant, it is by no means conclusive." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 490 (1987).

401 S.C. at 317, 737 S.E.2d at 621 (citation modified). The impact of diminution in value on our analysis is tenuous, based on the testimony of Gulfstream's expert. He testified Ordinance 2018-40 caused a $1,760,100 diminution in value of the restaurant, making the Gulfstream property only worth $89,900. However, he based his opinion on the "extraordinary assumption" that Gulfstream would lose access to all sixty-two spaces included in its easement. There is no evidence to support this extraordinary assumption, as there is no evidence Gulfstream has lost access to any parking spaces, much less every parking space.

Third, we must also consider whether Ordinance 2018-40 interferes with Gulfstream's distinct investment-backed expectations. "[C]ontinuation of the existing use of the property is the property owner's 'primary expectation' when considering an owner's investment-backed expectations for the property." *Id.* at 622, 737 S.E.2d at 319 (quoting *Carolina Chloride, Inc. v. Richland Cnty.*, 394 S.C. 154, 173, 714 S.E.2d 869, 878 (2011)). While Gulfstream has an investment-backed expectation in continuing to use its property as a restaurant, the circuit court correctly found Gulfstream "cannot have an investment-backed expectation of full use of the parking lot where the easement does not grant" such use. Gulfstream is not entitled to exclusive use of the parking lot at night, and the Ordinance does not interfere with Gulfstream's operation of its restaurant. The lack of interference with Gulfstream's investment-backed expectation weighs against a regulatory taking.

Each consideration under the *Penn Central* test weighs against the finding of a taking. Therefore, the circuit court did not err in ruling Ordinance 2018-40 was not a taking.

### 3. Inverse Condemnation

The circuit court did not err in denying Gulfstream's inverse condemnation claim. "An inverse condemnation occurs when a government agency commits a taking of private property without exercising its formal powers of eminent domain." *Hawkins v. City of Greenville*, 358 S.C. 280, 290, 594 S.E.2d 557, 562 (Ct. App. 2004). "An inverse condemnation may result from the government's physical appropriation of private property, or it may result from government-imposed limitations on the use of private property." *Byrd*, 365 S.C. at 656, 620 S.E.2d at 79.

We previously held there are four elements of an inverse condemnation claim: "(1) affirmative conduct of a government entity; (2) the conduct effects a taking; (3) the taking is for public use; and (4) the taking has some degree of permanence." *Id.* at 657, 620 S.E.2d at 79. However, in *Byrd*, we removed the element that the taking must have "some degree of permanence," and we held the element requiring the taking to be for public use does not apply to a regulatory taking. *Id.* "Consequently, there are only two elements to a regulatory inverse condemnation: affirmative conduct [by the government] and a taking." *Id.* at 657, 620 S.E.2d at 80.

The circuit court mistakenly applied the pre-*Byrd* test for regulatory takings. However, the outcome is the same under the two-part *Byrd* test. As for the first element, the circuit court correctly ruled the enactment of Ordinance 2018-40 was

affirmative conduct of the County. As for the second element, the Court must apply the *Penn Central* test to determine whether a taking has occurred. *Byrd*, 365 S.C. at 658, 620 S.E.2d at 80. As noted above, the circuit court correctly applied the *Penn Central* test in concluding there was not a taking; therefore, the circuit court's error in applying the pre-*Byrd* test to Gulfstream's inverse condemnation claim was harmless.

### III. Goggans' Involvement

Gulfstream argues Respondent Goggans' improper involvement with the original application for the new restaurant infected the entire approval process for what became Ordinance 2018-40. We disagree.

There is a "strong presumption in favor of the validity of municipal zoning ordinances, and in favor of the validity of their application, and when the planning commission and the city council of a municipality have acted after reviewing all of the facts, the court should not disturb the finding . . . ." *Harbit*, 382 S.C. at 391, 675 S.E.2d at 780. However, if the entity acted in "clear abuse of its discretion" or "acted illegally and in excess of its lawfully delegated authority" in passing a zoning ordinance, the ordinance must be declared invalid. *Id.*

The Ethics Commission reprimanded Goggans for his involvement in 1.0. Goggans paid a fine and recused himself from all involvement with 2.0 and 3.0. Council followed the proper process for approving both 2.0 and 3.0. 2.0 went through three readings at the Planning Commission level and three readings at the Council level. The only issue brought to light regarding 2.0 was that it exceeded the prior building's footprint. There was no change in 2.0 other than its submission as a major amendment, rather than as a minor amendment. The only changes to 3.0 were an adjustment to fit 3.0 within the old building's footprint and a change in the building height limit from forty-five feet to forty-seven feet. 3.0 received three readings at the Planning Commission level and three readings at the Council level. Council heard public comment, including comments by Gulfstream's attorneys and others in opposition to the amendment, before voting on the amendment.

Even considering the impropriety of Goggans' involvement with 1.0, Gulfstream cannot overcome the fact that two multi-member governing bodies approved both 2.0 and 3.0. Therefore, the circuit court properly ruled Goggans' involvement with 1.0 did not invalidate Ordinance 2018-40.

## IV.    Procedural Due Process

We affirm the circuit court's denial of Gulfstream's procedural due process claim.

Procedural due process requires notice, an opportunity to be heard, and judicial review.  S.C. Const. art. 1, § 22; *Stono River Env't Prot. Ass'n v. S.C. Dep't of Health and Env't Control*, 305 S.C. 90, 94, 406 S.E.2d 340, 342 (1991).

First, Gulfstream does not have standing to challenge any deficiencies in notices provided to *other* property owners.  Second, Gulfstream received notice of 3.0 and had a meaningful opportunity to be heard at planning commission meetings, county council meetings, and before the circuit court.  The application for 3.0 was complete before the planning commission proceedings, and Gulfstream was able to provide comments and concerns at every stage of review.  Gulfstream was duly notified of the 3.0 application, it was given the opportunity to be meaningfully heard at every stage, and it received exhaustive judicial review.

## V.    Attorney's Fees and Costs

The circuit court properly ruled in favor of Respondents on all claims.  Therefore, the circuit court did not err in its denial of attorney's fees to Gulfstream and its award of $9,065.54 in costs to Respondents.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court.[1]

**AFFIRMED.**

---

[1] In light of our disposition of this appeal, we need not address the County's argument that Gulfstream failed to timely challenge Ordinance 2018-03 (the ordinance approving 2.0), nor is it necessary to address the County's argument that Gulfstream is collaterally estopped from challenging Ordinance 2018-40.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) ("appellate court need not address remaining issues when disposition of prior issue is dispositive").

**FEW and VERDIN, JJ., concur. KITTREDGE, C.J., concurring in result only in a separate opinion in which HILL, J., concurs.**

**CHIEF JUSTICE KITTREDGE:**  I concur in result due to Gulfstream's failure to establish its damages for purposes of both its substantive due process and takings claims.  Gulfstream primarily sought money damages, not injunctive or other relief, thereby putting the issue of the economic impact of the regulation squarely at issue in this case.[2]  In support of its claim, Gulfstream presented expert testimony that, following the amendments to the Marlin Quay Planned Development (the PD), its property was devalued from $1.85 million to $89,000.  The Georgetown County Council did not present any competing testimony regarding the appropriate valuation of Gulfstream's property.  On the surface, therefore, Gulfstream established significant damages resulting from the county council's amendment to the PD.  I believe, however, that as a matter of law, any reliance on Gulfstream's expert and his valuation must be rejected because of one critical fact: the expert based his valuation on—as the majority opinion accurately describes—the "extraordinary assumption" that Gulfstream would lose access to the entirety of the parking lot.  It is undisputed that assumption has no basis in reality, as Gulfstream continues to share equal legal access to the parking lot before and after the county council's amendment to the PD.  Gulfstream made no attempt to quantify how much business it lost following the county council's amendment to the PD and the construction of the new business, such as by introducing evidence of a change in its profits or the number of customers it served.  The failure of Gulfstream's expert to take a realistic approach in calculating the actual economic impact of the amendments is fatal to Gulfstream's case.

Nonetheless, I am troubled by the county council's actions here and believe they warrant further comment, particularly as they relate to Gulfstream's claim for a substantive due process violation.  But-for Gulfstream's clear failure to quantify its

---

[2] To be more precise, in its complaint, Gulfstream sought money damages for both its takings and substantive due process claims.  However, Gulfstream also made a passing reference to receiving a declaratory judgment regarding its claim for substantive due process, asking the circuit court declare that the Georgetown County Council's approval of the amendments to the Marlin Quay Planned Development were improper and, therefore, null and void.  The new building that was the subject of the amendments was completely constructed before trial, essentially rendering moot Gulfstream's claim for declaratory relief.  Because declaratory relief can no longer be awarded, we are left only with Gulfstream's claim for money damages.  I therefore focus my attention on that aspect of Gulfstream's prayer for relief.

damages in any reliable fashion, I would find Gulfstream otherwise proved its substantive due process claim.

The majority opinion correctly sets forth the applicable law in terms of the presumption of constitutionality of the PD amendments and Gulfstream's related burden to establish the Georgetown County Council's decision was arbitrary and capricious. *Ani Creation, Inc. v. City of Myrtle Beach Bd. of Zoning Appeals*, 440 S.C. 266, 278, 890 S.E.2d 748, 754 (2023) ("A municipal ordinance is a legislative enactment and is presumed to be constitutional." (citation omitted)); *Rush v. City of Greenville*, 246 S.C. 268, 276, 143 S.E.2d 527, 531 (1965); *see also Rushing v. City of Greenville*, 265 S.C. 285, 217 S.E.2d 797, 799 (1975) ("The Court will not overturn the action of [a local government] if the decision is fairly debatable because the [locality's] action is presumed to have been a valid exercise of power and it is not the prerogative of the Court to pass upon the wisdom of the decision."). Respectful of the deferential standard of review, I nevertheless find overwhelming and uncontroverted evidence that Respondent-Councilman Steve Goggans engaged in self-dealing and inappropriate conduct from the outset that tainted the entire amendment process.

Goggans was both a member of the county council and financially involved in the underlying transaction, leveraging his position on county council to advance his financial interest by ushering through the amendments to the PD. For example, Goggans initially requested the planning department classify as a "minor" amendment his proposal to tear down the small marina store and restaurant and replace it with a building nearly three times its size and height.[3] Despite the vast disparity in sizes between the two buildings, Goggans claimed the new building would have the same "intensity of use" as the old building and, therefore, would require the same amount of parking spaces. To satisfy this fiction, Goggans advocated for the county council to consider only the heated square footage of the new building and ignore the massive new outdoor deck spaces. For whatever reason—whether because Goggans was a sitting councilman at the time or otherwise—the county council acceded to that request.

---

[3] Apparently, unlike applications for "major" amendments, applications for "minor" amendments do not require county council to give notice to or receive comments from the public. Everyone now concedes the attempted "minor-amendment" classification was a sham.

Moreover, as an additional safeguard to ensure the new building did not "intensify" the use of the parking lot in the PD, the county council required the new building to have the same seating capacity (but not the same occupancy limit) as the old building. In doing so, the county council treated the new building differently from any other building in Georgetown County.[4] Goggans then touted his accomplishments to his client and asked the client to pay him an extra $72,000 for navigating the amendments to the PD through the county council to successful completion, including:

1. The county council's approval of an "extensive porch" without it being counted against the square-footage requirement;

2. The "doubling [of] the size of the enclosed space" in the new building as compared to the previous store and restaurant building; and

3. The county council's decision "that the existing parking [lot], which is substandard, would comply with the zoning requirements" despite the drastic increase in size of the new building.

I believe the propriety of these various actions speak for themselves. Indeed, as noted by the majority, Goggans was sanctioned by the Ethics Commission for his improper conduct. It is therefore incomprehensible to me why, after Goggans was forced to recuse himself from participating in versions 2.0 and 3.0 of the amendments, and the amendments were treated as "major" changes to the applicable zoning ordinance, the county council did not revisit any of the special concessions initially afforded to Goggans's pet project. To me, the fact that the parking requirements for the new building were considered in light of only the heated square footage and seating capacity, and the new building is the *only* building in the county for which that is true, demonstrates the county council's decision was arbitrary and capricious.

Nevertheless, as noted above, Gulfstream's claims—including due process—must

---

[4] For comparison, the county council typically considers the *gross* square footage of all other buildings in Georgetown County, not merely the *heated* square footage. Likewise, while former versions of the zoning ordinances required consideration of the seating capacity of a building, those prior versions of the ordinances have long been abandoned, so the county council typically does not consider seating capacity in its calculations and decisions.

fail due to its failure to adequately quantify its damages. I therefore join the majority in result.

**HILL, J., concur.**